**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

TIMOTHY SLATER and
DEBORAH SLATER,

        Plaintiffs,

vs.                                   Case No. 3:13-cv-345-J-34JBT

HARTFORD INSURANCE COMPANY
OF THE MIDWEST,

        Defendant.

_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action is before the Court for the entry of findings of fact and conclusions of law.

Property owners Timothy and Deborah Slater (Slaters or Plaintiffs) filed a breach of contract

action against insurer Hartford Insurance Company of the Midwest (Hartford or Defendant)

alleging that Hartford failed to pay under the terms of a flood insurance policy.[1]  The Court

conducted a two-day bench trial on August 19 and 20 of 2014, and thereafter, the parties

submitted their proposed findings of fact and conclusions of law.  See Plaintiffs' Proposed

Findings of Fact and Conclusions of Law (Doc. No. 72; Plaintiffs' Proposed Findings and

Conclusions); Hartford Insurance Company of the Midwest's Suggested Findings of Fact and

Conclusions of Law (Doc. No. 73; Defendant's Proposed Findings and Conclusions).  Having

reviewed the pleadings, examined the evidence, observed the witnesses, and considered the

---

[1]     The Court previously denied Plaintiffs' Motion for Partial Summary Judgment and
Memorandum of Law (Doc. No. 28) and granted in part, and denied in part, Defendant's, Hartford
Insurance Company of the Midwest's Motion for Summary Judgment and Incorporated Memorandum.
(Doc. No. 36).  See Order (Doc. No. 41; Order on Summary Judgment Motions).  The Court granted
summary judgment in favor of Defendant only to the extent that Plaintiffs asserted that "(1) Hartford
repudiated the Standard Flood Insurance Policy that it issued to the Slaters, and (2) that Hartford is
estopped from denying the Plaintiffs' claim."  Order on Summary Judgment Motions at 32.

arguments of counsel as well as the remainder of the record, the Court makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure (Rule(s)).

## I.      Findings of Fact

Plaintiffs Timothy and Deborah Slater owned property located at 537 Magnolia Street in Neptune Beach, Florida. <u>See</u> Bench Trial Transcript (Doc. Nos. 66 & 67; Transcript) at 13-14, 42.[2]  The Slaters purchased a Standard Flood Insurance Policy for their property through Hartford, a Write-Your-Own Program (WYO Program) company participating in the National Flood Insurance Program (NFIP).[3]  <u>See id.</u> at 43; Defendant's Exhibit 1, Flood Policy

---

[2]         The Slaters sold the home a few months prior to trial. <u>See</u> Transcript at 95.

[3]         The NFIP is a federally supervised and guaranteed insurance program administered by the Federal Emergency Management Agency (FEMA), pursuant to the National Flood Insurance Act of 1968, as amended, 42 U.S.C. § 4001 <u>et seq.</u> (NFIA), and corresponding regulations. <u>See</u> 44 C.F.R. §§ 59.1-77.2; <u>see also</u> <u>Flamingo S. Beach I Condo. Ass'n, Inc. v. Selective Ins. Co. of Southeast</u>, 492 F. App'x 16, 17-18 (11th Cir. 2012); <u>Carneiro Da Cunha v. Standard Fire Ins. Co. / Aetna Flood Ins. Program</u>, 129 F.3d 581, 583 (11th Cir. 1997).   Pursuant to 42 U.S.C. § 4081(a) of the NFIA, FEMA created the WYO Program), which allows private insurers to issue and administer flood insurance policies under the NFIP to assist FEMA in its statutory duty to administer the NFIP.  <u>See</u> <u>Newton v. Capital Assurance Co.</u>, 245 F.3d 1306, 1308 (11th Cir. 2001) (citing 42 U.S.C. § 4081(a)).  The WYO Program allows private insurance companies ("WYO insurers") to issue Standard Flood Insurance Policies ("SFIP") in their own names, while serving as fiscal agents of the United States.  <u>See</u> 42 U.S.C. § 4071(a)(1); 44 C.F.R. § 62.23(f-g) (the "Arrangement"); <u>see also</u> <u>Flamingo S. Beach</u>, 492 F. App'x at 18; <u>Shuford v. Fid. Nat'l Prop. & Cas. Ins. Co.</u>, 508 F.3d 1337, 1339 (11th Cir. 2007).  Under the WYO Program, "the federal government underwrites the policies and private WYO carriers perform significant administrative functions including 'arrang[ing] for the adjustment, settlement, payment and defense of all claims arising from the policies.'"  <u>Campo v. Allstate Ins. Co.</u>, 562 F.3d 751, 754 (5th Cir. 2009) (citation omitted).   However, while these WYO policies "are written by private firms, the federal government acts as the guarantor and reinsurer," and SFIP claims are ultimately paid by the United States Treasury.  <u>Flamingo S. Beach</u>, 492 F. App'x at 18; <u>see also</u> <u>Shuford</u>, 508 F.3d at 1342-33; <u>Newton</u>, 245 F.3d at 1311; 44 C.F.R. Pt. 62, App. A, art. III(D)(1).

Declarations Plaintiffs' Exhibit 13 & Defendant's Exhibit 5,[4] Dwelling Form, Standard Flood Insurance Policy (SFIP).[5]

On June 26, 2012, while the subject policy was in full force and effect, Tropical Storm Debby caused flooding in Northeast Florida, including in and around the Slaters' home. See Joint Final Pre-Trial Statement (Doc. No. 42; Pre-Trial Statement) at 7; Transcript at 14, 44. At approximately 1:00 a.m. on June 27, 2012, Deborah Slater discovered about an inch (or slightly greater than an inch) of standing water in their home and screamed. See Transcript at 14-15, 45-46, 99, 228-29. Her husband, who had fallen asleep in a chair, awoke and the two sprung into action, using towels to try to dry the area. See id. at 45. Later that morning, Timothy Slater called Hartford insurance agent George Garcia. Id. at 45-46. Hartford assigned insurance adjuster Gil Baran to handle the Slaters' claim. Id. at 50-51, 226-27. The Slaters also called ServPro to assist them in getting rid of the standing water and removing moisture from their home. See id. at 21, 46-47; see also Plaintiffs' Exhibit 14 (ServPro Records). To accomplish this, beginning on June 28, 2012, ServPro put in three dehumidifiers and six air movers, removed the baseboards around the house, and sprayed antimicrobial solution. See Transcript at 25-26, 29-30, 47; ServPro Records.

Meanwhile, on July 1, 2012, the Slaters met with Baran, who toured the house, examined the damage, and explained the claims process. See Plaintiffs' Exhibit 22

---

[4]  Several of the exhibits Hartford introduced into evidence were already in evidence as Plaintiffs' exhibits.

[5]  The SFIP is a Dwelling Form policy published in the Code of Federal Regulations at 44 C.F.R. Pt. 61, App. A(1).

(Preliminary Report)[6]; Transcript at 50-51.  Baran also spoke with the ServPro technicians and determined that the Slaters were acting appropriately in removing the water.  See Transcript at 51-56.  In his Preliminary Report, Baran assigned the Slaters' flood claim a date of loss of June 26, 2012, and noted that water entered their home on June 26, 2012, at 12:00 a.m. and receded June 27, 2012, at 12:00 a.m.  During this one day period, up to an inch of water remained on the inside of the Slaters' home.  See Preliminary Report.  Over a several day period, ServPro was able to reduce significantly the relative humidity in the Slaters' home.  See Transcript at 33-34; ServPro Records.[7]

Despite these efforts, beginning approximately a week after the flood, Timothy Slater found mold and mildew under the floors, in the cabinets, on the drywall, on the paper backing of the insulation, and on the wood furring strips[8] on the walls of their concrete block house. See Transcript at 58.  Deborah Slater suffers from a heightened sensitivity to mold and other household substances, a condition she has suffered from since childhood.  See id. at 12-13. Prior to the flooding, Deborah Slater did not have any allergic reactions when in her home. See id. at 16.[9]  After the flooding, whenever Deborah Slater entered the home, she had an allergic reaction and was forced to leave immediately.  See id. at 15-16, 56-58.  As a result,

---

[6]    There are two Preliminary Reports in evidence that appear to be identical except one is dated July 7, 2012 (Plaintiff's Exhibit 22), and the other is dated August 23, 2012 (Defendant's Exhibit 3).

[7]    The ServPro Records include a Drying Zone Monitoring Report that is also in evidence as part of Defendant's Exhibit 24.

[8]    Furring strips are 1x2 pieces of wood that attach dry wall to the exterior walls made of concrete block.  Transcript at 150.

[9]    The Slaters took steps after they purchased their home to reduce allergens, such as removing all the carpeting and replacing the HVAC with a new system.  See Transcript at 14.

the Slaters made extensive repairs they believed were necessary to restore their home.  See id. at 16.  Among these repairs, roughly five weeks after the flood, in early September of 2012, the Slaters removed the cabinets and vanities from the home.  See id. at 86-87.  Around the same time frame, the Slaters engaged MicroTech for assistance in repairing the flood damage, including opening the walls up about eighteen inches to two feet from the ground, removing the tile and wood flooring, and spraying antimicrobial solution.  See id. at 87-88.  Because Deborah Slater was still having reactions, Timothy Slater did intermittent spot-checks to ascertain the cause, and discovered mold, from the sheetrock to the insulation, to the furring strips, all the way to the paper backing of the insulation in the attic, such that the Slaters concluded they needed to take down the ceilings.  See id. at 94.  In their testimony at trial, neither Deborah nor Timothy Slater identified the rooms in which they found mold and accordingly which rooms required which repairs.

While the Slaters were attempting to repair their home, they maintained limited contact with Hartford's claims adjuster.  In a Flood Damage Closing Report, Baran listed the repairs he found necessary as follows:

> BUILDING ADJUSTMENT: At our inspection we documented a 5-7" outside water line and a 1+" inside water line.  The exterior requires pressure washing to the water line.  The interior requires flood loss clean up and mildewcide of the floor and walls to the water line.  In addition the insulation, drywall, and base molding requires removal and replacement in the living room, kitchen, both bedrooms and bathrooms.  Office did not have any damage at the time of inspection.  The cabinets in both bathrooms require removal and replacements, and the counter tops and bathroom sinks will need to be removed and reinstalled.  The wood floors are damaged and need to be removed and replaced (see photo 33)[.] At the time of our inspection, the interior and exterior doors do not require replacement.  The AC condenser is elevated and at the time of inspection did not appear to be damaged.  At the time of my inspection there did not appear to be flood damage to the hot water heater or kitchen appliances.

Defendant's Exhibit 6 (Flood Damage Closing Report) at 1-2.  For these damages, Baran prepared a building estimate dated August 25, 2012, which valued the repairs at $16,567.63, including $1,574.91 in recoverable depreciation.  See Plaintiffs' Exhibit 11 & Defendant's Exhibit 25 (Building Estimate).[10]  On the same day Baran generated the Building Estimate, a Saturday, he sent an e-mail to the Slaters with an attachment containing a completed proof of loss, with instructions for them to sign the form and return it by Monday, August 27, 2012. See Transcript at 60-61; Plaintiffs' Exhibit 21 (E-mail Chain); Plaintiffs' Exhibit 25 (Final Report).  The e-mail attachment included a Final Report listing the same loss total as the Building Estimate minus the depreciation and the Slaters' $1,000 deductible, for a net amount claimed of $13,992.72.  See Final Report.

Viewing the amount of the loss proposed by Baran to be a gross underestimate of the damage, the Slaters responded to the e-mail on August 26, 2012, attaching repair estimates they had obtained from MicroTech Water Damage Control, Inc. (MicroTech) and Shaycore Enterprises (Shaycore).  See Transcript at 61-64, 72; Plaintiffs' Exhibit 3A (MicroTech Estimate) and Exhibit 3B (Original Shaycore Estimate).  The Slaters also sent this e-mail to Garcia as their Hartford Insurance agent, who then forwarded the e-mail with attachments to the National Flood Service (NFS) that handles Hartford's claims.  See Transcript at 72-73, 220, 291-92; E-Mail Chain; Defendant's Exhibit 2 (NFS Claims Xchange Log) at 3.  On the Proof of Loss form provided by Baran, Deborah Slater made handwritten notes listing "Microtech $20,164.31," "Shaycore $103,184.20" and "Out of Pocket $2500.00" as their

---

[10]     Baran did not make an initial finding or estimate as to content damage because he was waiting for an itemization of damage from the Slaters.  See Flood Damage Closing Report at 2.

damages, and both she and Timothy Slater placed their initials next to each of these amounts. <u>See</u> Transcript at 64, 79; Plaintiffs' Exhibit 8 & Defendant's Exhibit 12 (First Proof of Loss). The total of these handwritten amounts is $125,848.51. The Slaters then physically took the First Proof of Loss with the estimates to Garcia for submission to Hartford on August 27, 2012. <u>See</u> Transcript at 64, 73. At Garcia's suggestion, the Slaters also handwrote "Policy limits $250,000/100,000" on the First Proof of Loss, but neither initialed next to these amounts because their estimate totals were less than the policy limits. <u>Id.</u> at 74-75, 80-81; First Proof of Loss. Therefore, the Slaters were not seeking the policy limits in the First Proof of Loss. Garcia then submitted the complete First Proof of Loss to Hartford that same day. <u>See</u> Transcript at 78-79.

The following day, August 28, 2012, the Slaters submitted a Supplemental Proof of Loss. <u>See</u> Transcript at 71-73; Plaintiffs' Exhibit 9 & Defendant's Exhibit10 (Supplemental Proof of Loss). In response to the line requesting the "Net Amount Claimed," the Supplemental Proof of Loss bears the typewritten entry "$125,293.38." Additionally, under "Time and Origin," is the handwritten entry: "Flood 26-28 day of June 2012." <u>See</u> Supplemental Proof of Loss. Both the First and Supplemental Proofs of Loss were signed and sworn to by the Slaters, and dated August 27 and 28 of 2012, respectively. Upon receipt of the Slaters' claim, Hartford issued payment in the amount of $15,567.63. <u>See</u> Defendant's Exhibit 4 (Check Copies). This first payment covered the total amount of Baran's Building Estimate, including recoverable depreciation, after the $1,000 deductible. <u>See</u> Defendant's Exhibit 23 (September 4, 2012 Letter). In a separate letter dated September 12, 2012, Hartford denied the Slaters' request for additional payment beyond the Building Estimate,

stating that Hartford had "not received the necessary information to substantiate the amount being claimed." Defendant's Exhibit 11 (September 12 Letter).[11]

The Slaters hired a public adjuster, Mark Goldwich, and administratively appealed the denial of their claim to FEMA with his assistance. FEMA responded to this appeal in a letter dated February 19, 2013. See Defendant's Exhibit 7 (FEMA Letter). In the letter, FEMA claims director James Sadler explains:

> The invoice that Mr. Slater submitted from MicroTech Water Damage Control, Inc. for $20,164.31 included non-covered items and above-standard charges excluded under the coverage conditions of his Standard Flood Insurance Policy (SFIP). Coverage is not afforded for supervision, personal protective equipment, job-site storage containers, boxes, packing material and bubble wrap, HEPA filters, the dismantle, containment, and breakdown of equipment, equipment decontamination, and full face respirator, as they are not considered repairs associated with a direct physical loss due to flood, as defined in the SFIP. These costs were correctly omitted from the loss adjustment. Likewise, the contractor's estimate prepared by Shaycore Enterprises totaling $103,184.20 included damage due to differential settlement excluded by the SFIP under section V. Paragraph C., and appeared broad and excessive when compared to the actual demonstrable flood related damage.

See id. at 1. However, FEMA indicated that it found some merit in the appeal and referred the matter to Hartford for readjustment. See id. at 2. Baran conducted a supplemental review and readjusted the claim at a total of $46,284.89. See Defendant's Exhibit 16 (Revised Building Estimate); Transcript at 257-58.[12] On March 23, 2013, Hartford paid the

---

[11]   The September 12 Letter appears to be a denial of the Supplemental Proof of Loss for $125,293.38; however, Hartford did not separately deny the First Proof of Loss. See Transcript at 297.

[12]   In a supplemental Flood Damages Closing Report dated February 11, 2013, Baran stated:

> Based on a review of the claim the following additional items have been added to the supplement claim. The tile floor, an additional 2 ft of drywall, an additional 2 ft of insulation, replace lower kitchen cabinetry, remove and re-install kitchen counter-top have been added to the supplement. See attached NI photos showing damage to

(continued...)

difference between this amount and the amount it had already paid (minus the $1,000 deductible)—$29,717.26. See Defendant's Exhibit 13 (April 5, 2013 Letter). In reconsidering the Slaters' claim, Baran also adjusted the Slaters' content losses after they provided a paid invoice for content cleaning in the amount of $1,071.03. See Defendant's Exhibit 17 (Contents Inventory); Plaintiff's Exhibit 12 & Defendant's Exhibit 15 (Second Supplemental Flood Damage Closing Report) at 2. This amount was also subject to a $1,000 deductible; therefore, Hartford only paid $71.03. See Contents Inventory; April 5, 2013 Letter. Thus, Hartford issued a total of $45,355.92 to the Slaters in three separate checks. See Check Copies; see also Pre-Trial Statement at 7.

On March 29, 2013, the Slaters filed this lawsuit. See Complaint and Demand for Trial by Jury (Doc. No. 1; Complaint). In the remaining count of the Complaint,[13] the Slaters allege breach of contract and seek payment of the balance of their property damage claim which Hartford failed to pay. See id. at 2-4; Pre-Trial Statement at 2. In their Pre-Trial Statement, the parties agreed that the amount at issue was $94,001.21, representing that this amount was the difference between what the Slaters requested and what Hartford had paid. See

---

[12](...continued)
cabinets and tile floor. I have also included added content items the NI submitted and content cleaning invoice. I have included the Micro Tech estimate, however the Micro Tech estimate includes several non covered items. These items are air scrubbers, HEPA filters, protective equipment and respirators. These items have been removed from the estimate. The original estimate gave allowance for mildewcide, air movers and dehumidifiers. I have removed the original amounts for these items from each room because the[y] are accounted for on the Micro Tech Invoice.

Defendant's Exhibit 20 (Supplemental Flood Damages Closing Report) at 2.

[13]    Plaintiffs also brought a second claim alleging professional negligence on the part of Hartford, based on an alleged violation of the standard of care provided by the Florida Administrative Code. See Complaint at 4-5. The Court granted Hartford's motion to dismiss Count II because it raised claims under state law which were preempted by the federal flood insurance regulatory scheme. See Order (Doc. No. 26) at 7. Count I alleging breach of contract is the only remaining claim.

-9-

Pre-Trial Statement at 2.  However, in making this calculation the parties listed $139,286.10 as the amount the Slaters requested.  See id.  This figure is the total requested in the Supplemental Proof of Loss, $125,293.38, and the typewritten amount originally requested in the First Proof of Loss, $13,992.72.  The Court finds that the Slaters were requesting only $125,848.51 in their First Proof of Loss.  This is evident in their Supplemental Proof of Loss, which did not include the additional $13,992.72.  Therefore, the amount at issue in this case is the difference between what the Slaters requested in their Supplemental Proof of Loss and what Hartford paid, which is $80,008.49.

## II.     Conclusions of Law

### A.     Proof of Loss

Preliminarily, the Court must address the sufficiency and timeliness of the First and Supplemental Proofs of Loss.  Under the SFIP, an insured must file a Proof of Loss "[w]ithin 60 days after the loss."  44 C.F.R. Pt. 61, App. A(1) VII.J.4.  A Proof of Loss is a statement by the insured informing the insurer - either FEMA or a WYO carrier - of the amount the insured is claiming under the policy.  See id.  The claimant's Proof of Loss "must be signed and sworn by the insured and provide the insurer with nine specific pieces of information, including the specifications of damaged buildings, detailed repair estimates, and a brief explanation of how the loss happened."  Sutor v. FEMA, Nos. 06-1371, 07-2477, 2009 WL 4268457, at *4 (E.D. Pa. Nov. 23, 2009) (citing 44 C.F.R. Pt. 61, App. A(1), art. VII.J.4.a.- I. Additionally, the SFIP provides:  "This policy cannot be changed nor can any of its provisions be waived without the express written consent of the Federal Insurance Administrator.  No action we take under the terms of this policy constitutes a waiver of any of our rights."  44

C.F.R. Pt. 61, App.A(1), art.VII.D; see also Shuford, 508 F.3d at 1339; Ambassador Beach

Condo. Ass'n, Inc. v. Omaha Prop. & Cas. Ins. Co., 152 F. Supp. 2d 1315, 1316 (N.D. Fla.

2001); 44 C.F.R. § 61.13(d) ("[N]o provision of the said documents shall be altered, varied,

or waived other than by the express written consent of the Federal Insurance Administrator.").

    The Eleventh Circuit Court of Appeals has observed that "strict compliance with the

provisions of federal flood insurance policies is required because payments are drawn from

the federal treasury." Shuford, 508 F.3d at 1343; see also Sanz v. U.S. Sec. Ins. Co., 328

F.3d 1314, 1318 (11th Cir. 2003) ("[T]he insured must adhere strictly" to the requirements of

an SFIP "before any monetary claim can be awarded against the government."); Richardson

v. Am. Bankers Ins. Co., 279 F. App'x 295, 298 (5th Cir. 2008) (holding that insured must

"show prior compliance with all of the policy's requirements, including the [proof of loss]

requirement"). As such, failure to file a timely Proof of Loss will bar an insured from recovery.

Sanz, 328 F.3d at 1317-18 (citing Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85

(1947)). However, some courts have held that "a proof of loss may be considered even if it

does not provide a 'specific amount of damages' as long as it 'provide[s] at least enough

information for FEMA to evaluate the merits of the claim.'" Tuircuit v. Wright Nat. Flood Ins.

Co., No. CIV.A. 13-6268, 2014 WL 4207639, at *3 (E.D. La. Aug. 25, 2014) (quoting

Copeland v. FEMA, No. CIV.A. 03-2704, 2004 WL 325577, at *3 (E.D. La. Feb. 18, 2004)).

    Although in a motion for summary judgment, Hartford challenged whether the Slaters

had submitted a timely proof of loss, at trial, Hartford did not dispute the timeliness of the

Slaters' First Proof of Loss.  Rather, it contended that the First Proof of Loss was

substantively deficient, and that because the supplemental proof of loss was untimely, it

could not cure the Slaters' failure to submit a timely complete proof of loss as required by the SFIP.  See Transcript at 193-97; Defendant's Proposed Findings and Conclusions at 4. Turning first to the First Proof of Loss, the Court readily concludes that it was timely submitted.  Regardless of whether the Slaters' loss date is considered to be the 26th, 27th, or 28th of June, the Slaters had until Monday, August 27th to submit their claim.  If the date of the loss is set at June 26 or 27, 2012, then the 60-day time limit for the Slaters to submit a timely Proof of Loss would have fallen on Saturday, August 25, 2012, or Sunday August 26, 2012, respectively.  In either scenario, applying the time computation framework of Rule 6(a),[14] the period for filing a proof of loss would continue until Monday, August 27, 2012.  See Smith v. Nat'l Flood Ins. Program of FEMA, 156 F. Supp.2d 520, 522-23 (E.D. Pa. 2001) (applying Rule 6(a) to the one-year statute of limitations computation in the NFIA, excluding the day of the event that triggers the period," and including the last day of the period unless the last day is a Saturday, Sunday, or legal holiday, in which case "the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday").  Moreover, if the date of loss was June 28, then the sixtieth day would have fallen on Monday, August 27, 2012.  The First Proof of Loss was signed and verified on Monday, August 27, 2012, and submitted to Hartford on that date.  Thus, under each of the foregoing scenarios, the First Proof of Loss was timely.

---

[14]    The Eleventh Circuit has observed that it has "long recognized as a general policy a legislative intent to apply Rule 6(a) to all federal statutes enacted or amended after the adoption of Rule 6(a) . . . . [and that] [t]his policy generally prevails unless the statute in question itself reflects a contrary intent." Am. Canoe Ass'n, Inc. v. City of Attalla, 363 F.3d 1085,1086 (11th Cir. 2004) (citations omitted) (applying Rule 6 computational analysis to Clean Water Act); see also Maahs v. United States, 840 F.2d 863, 865-66 (11th Cir. 1988) (Rule 6 computation of time applied to FTCA two-year requirement for claim to be brought such that the counting begins on the day after the cause of action arose and ends on the next day that is not a Saturday, Sunday, or legal holiday).  Thus, the court applies the Rule 6(a) computational analysis to the 60-day Proof of Loss deadline set forth in the NFIA.

Nevertheless, Hartford argues that the First Proof of Loss was deficient, not because of timeliness, but because the amount the Slaters claimed was ambiguous.  See Transcript at 194-97; Defendant's Proposed Findings and Conclusions at 4.  As stated in the Court's findings of fact above, the Slaters initialed three amounts:  the MicroTech and Shaycore estimates and their out-of-pocket costs.  While the First Proof of Loss form could certainly have been clearer, the Slaters initials next to each of these three amounts demonstrated that they were seeking the total of these three amounts, or $125,848.51.  Moreover, even if Hartford could not ascertain the precise dollar amount of the claim, the information the Slaters provided on the Proof of Loss form and the documents submitted with the form were sufficient to permit Hartford to evaluate the merits of their claim.  See Tuircuit, 2014 WL 4207639, at *3.  Thus, the First Proof of Loss satisfied the Slaters' obligation to submit a timely and complete proof of loss.

In an abundance of caution, the Court will address the effect of the Supplemental Proof of Loss.  Even if the timely First Proof of Loss was deficient due to the alleged ambiguity regarding the amount sought, the Supplemental Proof of Loss, if considered, would cure any such ambiguity.  However, Hartford contends that this document was untimely and thus cannot be considered.  See Defendant's Proposed Findings and Conclusions at 4.  The Court recognizes, as stated in the Order on Summary Judgment Motions, the existence of authority holding that a supplemental proof of loss is also subject to the 60-day filing deadline.  See Ambassador Beach Condo. Ass'n, 152 F. Supp.2d at 1316-17.  Additionally, courts have held that after the 60 day period expires, "the insured may not seek additional damages not reflected in the Proof of Loss."  Oaks v. Allstate Ins. Co., No. 05-191-REW,

-13-

2006 WL 3328179, at *5 (E.D.Ky. Nov. 14, 2006) ("Plaintiff may not avoid enforcement of the proof of loss requirement by 'supplementing' or 'amending' his original statement after the 60 day period expires"); Smith-Pierre v. Fid. Nat'l Indem. Ins. Co., No. 11-60298-CIV, 2011 WL 3924178, at *3 (S.D. Fla. Sept. 7, 2011) ("Plaintiff's original proof of loss cannot fulfill his obligation to submit a proof of loss for amounts not covered by the original proof of loss"); see also Howell v. State Farm Ins. Co., 540 F. Supp. 2d 621, 627  (D. Md. 2008) (plaintiffs "are limited to benefits they claimed in timely proofs of loss, even if they 'consistently disputed the amounts [that] the defendants should pay under the policy'" (citation omitted)).  Notably, while these cases appear to state a general rule that any supplemental proof of loss must be submitted within the SFIP 60-day time period, the supplemental claims in the cases were ultimately rejected for other reasons.

The Court also recognizes the existence of authority for the proposition that a supplemental proof of loss that is submitted out of time may be considered along with a timely proof of loss, if the supplemental submission makes a claim that is identical to that submitted in the timely proof of loss.  See Stogner v. Allstate Ins. Co., No. 09-3037, 2010 WL 148291, at *1 (E.D. La. Jan. 11, 2010); Young v. Imperial Fire & Cas. Ins. Co., No. 13-5246, 2014 WL 1456408 (E.D. La. April 15, 2014).  In Stogner, the court recognized that while "it is clear that supplementary proofs of loss are required when a claimant requests more in the supplementary claim than in the original claim . . . if the same amount is claimed, and only the decision is disputed, additional proofs of loss may not be necessary." Stogner, 2010 WL 148291 at *4 (emphasis added).  Similarly, in Young, the court denied the insurer's motion for summary judgment, determining that all of the insured's Proof of Loss forms, "taken

-14-

together with [the adjuster's] estimate that was sent [after the 60-day deadline], constitute a complete Proof of Loss that complies with the SFIP." Young, 2014 WL 1456408, at *3. There, the insured submitted three signed and sworn Proof of Loss statements for building damages, plus a detailed estimate of damages from a public adjuster to a WYO insurer. Id. at *1, 3.  The Young court  determined the Proof of Loss forms "taken together" with the adjuster's report "clearly state that plaintiffs' cost of repair is the amount estimated by [the adjuster's] detailed report, $260,235.83, and that plaintiffs claim their policy limit on building coverage, minus the deductible, which is $175,000," permitting the SFIP insurer to evaluate the insureds' claim for their policy limits based upon the damages and costs presented in the detailed report. Id. at *4.

In this case, the Supplemental Proof of Loss varies from the First Proof of Loss in that it included an exact figure of out-of-pocket costs and a typewritten total amount claimed.  The fact that the Slaters typed out the amount they were claiming serves only to resolve any ambiguity that may have existed in the First Proof of Loss and does not preclude Hartford from considering their claim as timely.  However, the difference in the out-of-pocket costs is relevant to the extent that the out-of-pocket costs listed in the Supplemental Proof of Loss were greater than the $2,500 included in the First Proof of Loss.  Because the Slaters cannot increase the claimed amount outside of the sixty-day period, absent waiver, the Slaters are not entitled to recover the additional $444.87.[15]

---

[15]     Although it appears that the Slaters are actually requesting a lower amount than in the First Proof of Loss, on the Supplemental Proof of Loss form, the Slaters subtracted their $1,000 deductible.  Before their deductible, they sought $126,293.38, which is $444.87 greater than the $125,848.51 sought in the First Proof of Loss.  This difference is solely attributable to the out-of-pocket cost increase from $2,500 to $2,944.87.

In consideration of the foregoing, the Court concludes that the First Proof of Loss was both sufficient and timely.  Moreover, even if the timely First Proof of Loss was deficient due to ambiguity, when combined with the Supplemental Proof of Loss, the Slaters satisfied the requirements of the SFIP.  As such the proof of loss requirement presents no bar to recovery of proceeds under the SFIP.  Having determined the Slaters properly submitted the claim, the Court turns to whether the damages for which they seek reimbursement are covered under the SFIP.

### B.    Covered Losses

Pursuant to the SFIP, if the Slaters pay the correct premiums, comply with all terms and conditions of the SFIP, and furnish accurate information and statements, Hartford will pay them "for direct physical loss by or from flood to [their] insured property."  SFIP at 1; 44 C.F.R. Pt 61, App. A(1) Section I.  The SFIP defines "direct physical loss by or from flood" as "[l]oss or damage to insured property, directly caused by a flood.  There must be evidence of physical changes to the property."  SFIP at 2; 44 C.F.R. Pt 61, App. A(1) Section II(B)(12).  However, the SFIP does not insure "direct physical loss caused directly or indirectly by":

> Water, moisture, mildew, or mold damage that results primarily from any condition:
> a.    Substantially confined to the dwelling; or
> b.    That is within your control, including but not limited to:
> (1) Design, structural, or mechanical defects;
> (2) Failure, stoppage, or breakage of water or sewer lines, drains, pumps, fixtures, or equipment;
> (3) Failure to inspect and maintain the property after a flood recedes.

SFIP at 9-10; 44 C.F.R. Pt 61, App. A(1) Section V(D)(4).  It is the Slaters' burden as the insureds to prove that any additional compensation they seek is due under the terms of the policy.  See SFIP at 12-13; 44 C.F.R. Pt 61, App. A(1) Section VIII(J); see also Moffett v.

Computer Sciences Corp., Civil No. PJM 05-1547, 2011 WL 673777, at *1 (D. Md. Feb. 17, 2011); Mahood v. Omaha Prop. & Cas., 174 F. Supp. 2d 284, 293 (E.D. Penn. 2001) ("It is the plaintiff's burden to prove the amount he can recover.  The court may not guess the reasonable price for repairs covered under the policy.").

To establish the flood damage to their home, the Slaters provided their own testimony, the testimony of Ryan Sobolewski on behalf of MicroTech, and the testimony of Lisa Rowell, an industrial hygienist, as well as the adjuster's reports.[16]  Along with their Proposed Findings and Conclusions, the Slaters submitted a copy of the Shaycore Estimate (Doc. No. 74-1 at 3-19) annotated to reflect the line items for which Hartford previously compensated them.[17]  Although Hartford paid $45,284.89 for building damages, the submitted payments (marked on the Shaycore estimates in blue) total $41,899.21.  See id.  The Slaters have not explained this discrepancy, and neither party suggests what evidence available to the Court might resolve the discrepancy.  Thus, while the Court accepts that Hartford paid the Slaters $45,284.89, the requested repairs reflected in the Shaycore estimate account for only $41,899.21 of the total repairs occasioned by the flood.

---

[16]     The Slaters also presented the testimony of Mark Goldwich, their public adjuster. However, Goldwich did not provide relevant testimony, as he was not qualified to opine as to whether the flood caused any damage to the foundation of the Slaters' home and otherwise did not expound as to the necessity of the repairs as they related to the flood.  See Transcript at 106-107, 110.

[17]     At the conclusion of trial, the Court directed both parties to review the evidence including the estimates and the payments Hartford made and submit a reconciliation of the repair estimates and payments.  See Transcript at 318-19.  The Slaters' counsel represents that Hartford did not address or respond to their reconciliation reflected on the Shaycore Estimate despite multiple e-mails requesting its participation.  See Doc. No. 74-1 at 1-2.  At trial, Hartford pointed to its Exhibit 16, the Revised Building Estimate from Baran, as a line-by-line breakdown of its payments.  See Transcript at 311, 318.  As the line items in the Revised Building Estimate are not identical to those in the Shaycore and MicroTech Estimates, the Court directed the parties to explain what repairs had been paid for, what had been denied, and what the Slaters claimed they were still owed.  See id. 318-20.  Because Hartford had an opportunity to respond to the Slaters' proposed reconciliation of the evidence and chose not to do so, the Court accepts the Slaters' breakdown of Hartford's payments.

The Slaters suggest that their Proof of Loss satisfies their burden of establishing their entitlement to payment under the policy for the full sum which they seek because the Proof of Loss includes the almost twenty-page estimate from Shaycore providing "detailed, room-by-room descriptions of the repairs required as a result of the flood."  Plaintiffs' Proposed Findings at 4.  However, the Shaycore estimate does not address the question of whether each of the listed repairs was necessary or whether it was covered under the SFIP, that is, whether each repair was necessary as a direct result of the flood.  Despite a warning from the Court of the need to present this specific evidence as to the various repairs, the Slaters did not do so.[18]  For example, the estimate contains a sum of money for the apparent

---

[18]      In reversing a district court's judgment in favor of insureds based on the absence of evidence, the Fifth Circuit Court of Appeals explained:

> The problem with the argument on appeal that more should be paid is that the Monisteres presented only their own testimony and submitted the estimates provided by Whites & Whites.  Among the factual issues unaddressed by that evidence are how this damage avoided the policy requirement of direct physical loss, and of not paying for damage such as from mold that occurs after the flood waters recede.  No evidence was offered to justify paying for damage on the second floor resulting from flood waters on the first floor.  We do not know if the Monisteres could have factually supported the type of causation that was consistent with the policy terms.  We are finding only that they never did.

> We close with one piece of obviously self-serving but instructive testimony by State Farm.  One of the adjusters testified that if the repairs for which no coverage or at least some question existed were removed, State Farm had already paid more than the Monistere's estimate would justify.  Whether that is true or not, it identifies why we cannot go through the estimate in a search for some clearly appropriate claims.  No one questions that the Monisteres were entitled to substantial coverage under the flood policy.  This whole suit has been about whether they were entitled to more than they had already received.  We find no basis in this record on which the district court could have awarded a specific additional sum or even have determined that more was owed.

Monistere v. State Farm Fire & Cas. Co., 559 F.3d 390, 397-98 (5th Cir. 2009).  While the Slaters did present some evidence as to the condition of their house following the flood, this evidence was too general to support an award of damages for the specific line items in the Shaycore Estimate.  For example, Rowell testified that, "if there's trapped moisture under tile, you have to remove it.  There's no other way to release that trapped moisture, which then could result in elevated humidity and other things."  Transcript at 189.  Hartford paid for the removal and replacement of the ceramic tile for a majority of the
(continued...)

replacement of the Heat, Vent & Air Conditioning system, but the Slaters presented no evidence explaining why the system had to be replaced as a result of the inch of water that stood in the Slaters' home for approximately one day.  See Shaycore Estimate at 2. Similarly, they presented no testimony or other evidence regarding the effect of the flood on the foundation of the house, yet they continue to seek proceeds under the SFIP for repairs caused by damage to the foundation.  Indeed, the only evidence regarding damage to foundation was Timothy Slater's testimony that the foyer was suddenly a different level than the rest of the house.  Transcript at 59.  This is not sufficient to justify the "additional leveling cement" charges for various rooms throughout the house in the Shaycore Estimate.[19]

With respect to some of the other repairs, the Court recognizes that Timothy Slater testified generally as to the types of places he discovered mold in the home, such as the drywall, insulation, and cabinets.  However, he did not identify the rooms in which he found the mold and accordingly the Court cannot determine which specific areas throughout the house needed to be cleaned.  Nor can the Court determine where specific walls or cabinets

---

[18](...continued)
rooms in the house but not in the family room, third bedroom, or dining room.  Rowell's testimony could have established that the removal and replacement of the tile in these rooms was necessary as a direct result of the flood, if it had been combined with other evidence that these rooms had flooded and water remained underneath the tile.  See Shaycore Estimate at 4, 8, 11.  However, the Slaters presented no such evidence.

[19]        Another example of requested repairs for which the Slaters failed to present evidence of necessity or causation, is the removal and replacement of the interior doors in rooms throughout the house.  See Shaycore Estimate at 4-5, 7-9, 12-13.  The only evidence in the record with regard to this specific repair is found in the Flood Damage Closing Report, which reflects that, at the time of Baran's inspection, "the interior and exterior doors do not require replacement."  Flood Damage Closing Report at 2; Supplemental Flood Damage Closing Report at 2.  The Slaters did not present any contrary evidence suggesting that the doors needed to be replaced.

needed to be removed and replaced.[20]   Mold in some locations or on a particular cabinet does not mean that all of the walls or all of the cabinetry must be replaced due to repair damage sustained as a direct result of the flood.  Without specific testimony, the Court is unable to conclude that the entirety of the uncompensated repairs in the Shaycore Estimate were covered losses under the SFIP.

The Court can determine, however, from the evidence at trial that the removal and replacement of two feet of insulation in each affected room and sealing the stud wall for a Category 3 loss was a direct result of the flood.  In Baran's Building Estimates and Flood Damage Closing Reports, he found that the insulation and drywall needed to replaced in the living room, kitchen, both bedrooms and bathrooms.  For some rooms, Hartford paid for sealing stud walls.  Additionally, Sobolewski testified that Category 3 black water damage, which could encompass mold, poses a significant threat to human health because it carries anything from the outside environment from pesticides to heavy metals.  See Transcript at 144-45.  When asked if building components must be removed if they come in contact with Category 3 black water, Sobolewski testified:

> Depends on the building component.  By definition, porous materials should be. In regards to, you know, permanent fixtures such as studs and sill plates, framing members, there's a specific method to remediate and salvage those. Those can be saved.  But as far as drywall is concerned, it should be removed. Insulation being another example that should be removed.

---

[20]      For example, Timothy Slater's testimony that he found mold in the cabinets does not establish whether there was mold in both the lower and upper cabinets or whether the Slaters replaced the upper cabinets so that they would match the lower cabinets which were replaced due to damage. Cabinet replacement to accomplish matching is not covered under the SFIP as it is not necessary as a direct result of the flood; therefore, without further evidence as to the location of the mold Timothy Slater discovered, the Court cannot determine that the replacement of the upper cabinets was a covered loss.

Id. at 145. Based on this evidence, the Court concludes that the insulation replacement up to two feet in the Shaycore Estimate in the foyer, garage, living room, master bath, hall bath, second bedroom and closet, kitchen, master bedroom, and great room, and sealing the stud walls in those rooms (to the extent not already paid by Hartford) are uncompensated repairs directly associated with the flood.[21] The total amount of these repairs, as listed in the Shaycore Estimate, is $967.43.

Additionally, as to the out-of-pocket costs, the Court determines that the sandbags purchased for $125.95 were a covered expense under the SFIP. See SFIP at 5; Exhibit 3C. Timothy Slater testified that he purchased the sandbags and placed them outside his garage in anticipation of flooding. See Transcript at 44-45. It was reasonable for him to do so in light of the impending tropical storm, and this amount is well below the $1,000 limit for such

---

[21]    The Court notes that the Shaycore Estimate includes these charges for bedroom 3 as well as other charges such as drywall replacement that Hartford paid for in other rooms. See Shaycore Estimate at 8. Although Hartford did not make any payments for this room, Baran's Flood Damage Closing Report indicates that there was no damage in the office. It appears that the Slaters were using their third bedroom as an office because Baran only refers to two bedrooms. See Flood Damage Closing Report at 1. As the Slaters did not testify that there was flooding in the office or third bedroom, the Court has no evidence on which to support an award of damages for bedroom 3 as listed in the Shaycore Estimate. Similarly, although there are charges to replace the drywall and insulation in the dining room, the Court has no information as to the extent, if any, of flooding in the dining room. Indeed, it appears from the ServPro Drying Zone Monitoring Report that the dining room was listed as an "unaffected area."

Another distinction between the Shaycore Estimate and Baran's Revised Building Estimate is that the former separates the main living space into family room, living room, kitchen, and great room while the latter combines the kitchen and living room and does not mention the family or great rooms, although the Shaycore Estimate reflects that Hartford made payments for the great room but not the family room. The Court cannot determine from looking at the square footage allotted in each document for the room or combination of rooms whether the family room was also included as part of the living room/kitchen or whether it was not included because Hartford found no flood damage there. This is significant because the Court has no specific evidence about where the flood damage occurred except for the statements in Baran's Flood Damage Closing Reports. The Shaycore Estimate alone is not sufficient to establish that the repairs were directly associated with the flood. Accordingly, the Court only includes the additional insulation and stud-wall sealing for rooms that Hartford made payments for the drywall and baseboards, indicating these were rooms suffering from flood damage. For that reason, the Court excludes the relevant line items from the family room.

expenses.  See SFIP at 5.  With respect to the ServPro invoice, the Slaters presented no evidence at trial that the payment already received from Hartford did not compensate them for this expenditure, and the evidence suggests that it did.  Indeed, Baran's Revised Building Estimate reflected that Hartford paid for seven days of air movers and dehumidifiers.  See Transcript at 260-63, 67.  As to the remaining personal expenses, the Slaters have not pointed to where the policy provides for coverage of these items, including packing boxes or an increase in electricity.  Accordingly, of the submitted out-of-pocket costs, the Slaters are entitled to recover $125.95.

Last, with respect to the MicroTech Estimate, the Slaters have not presented evidence identifying specific covered repairs for which Hartford has failed to compensate them.  As $3,385.68 remains unaccounted for from Hartford's total payment, it appears that some portion of the proceeds previously paid were based upon the repairs reflected in the MicroTech Estimate.  Indeed, in his Supplemental Flood Damage Closing Report Baran explains that he included the MicroTech Estimate but noted that it included noncovered items and that he removed his original estimate allowance for mildewcide, air movers and dehumidifiers because they are accounted for on the MicroTech Invoice.  See Supplemental Flood Damage Closing Report at 2.  The Court is therefore unable to determine that the items in the MicroTech Estimate, assuming they were directly associated with a flood loss, represent uncompensated damages.  Moreover, the Court notes that the MicroTech Estimate largely consists of charges that the SFIP does not cover, such as decontamination of equipment, supervision, HEPA filters, the dismantle, containment, and breakdown of equipment, personal protective equipment and full face respirator.  See FEMA Letter at 1.

In light of the foregoing, the Court determines that the Slaters have failed to meet their burden to prove that Hartford failed to pay for losses that were covered under the SFIP,[22] with the exception of the specific charges listed above.[23] Accordingly, it is hereby **ORDERED:**

The Clerk of the Court is hereby directed to enter judgment in favor of Deborah and Timothy Slater and against Hartford Insurance Company of the Midwest, in the amount of $1,093.38, and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 24th day of March, 2015.

MARCIA MORALES HOWARD
United States District Judge

---

[22]     The Court recognizes that Mr. Sobolewski testified that the work proposed in Plaintiffs' Exhibit 9, which includes both MicroTech Estimates, was reasonable and necessary in his professional opinion. Transcript at 134. However, "reasonable and necessary" is not synonymous with covered under the SFIP, absent testimony or other evidence that the repairs were associated with a direct physical loss due to flood.

[23]     Additionally, the Court recognizes that the Slaters refer to two separate MicroTech estimates in their Proposed Findings and Conclusions. See Plaintiffs' Proposed Findings and Conclusions at 8. While there are two invoices in the record, one for $15,972.03 (Additional MicroTech Estimate) and the MicroTech Estimate for $20,164.31, in submitting their First Proof of Loss, the Slaters only wrote out the $20,164.31 amount. Indeed, in totaling the amount of their claim, they did not include the Additional MicroTech Estimate (as discussed above, they sought $125,293.38, which is the MicroTech Estimate of $20,164.31, the Shaycore Estimate, and their out-of-pocket costs). Because the Additional MicroTech Estimate was not included in either Proof of Loss as part of the amount claimed, the Slaters are not entitled to recover that amount. Even assuming attaching the Additional MicroTech Estimate with the other Microtech Estimate and the Shaycore Estimate was sufficient to make a claim for this amount, the Slaters did not prove that the charges listed were for repairs associated with a direct physical loss due to flood, as defined in the SFIP. All the charges in this lesser estimate were for content restoration, and the Slaters provided no testimony as to the specific damage to the contents of the home.

lc16

Copies to:

Counsel of Record